Having received no objections to this Report and Recommendation (the "R&R"), I review it for clear error.  Finding none, I hereby adopt the R&R as the decision of the Court.  Defendant's motion for judgment on the pleadings is GRANTED.  The Clerk of Court is respectfully directed to send a copy of this endorsement to Plaintiff, terminate Doc. 16, and close the case.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

LILIANA RIVERA,

                            Plaintiff,

              -against-

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
-------------------------------------------------------------X

SO ORDERED.

_Cathy Seibel_
CATHY SEIBEL, U.S.D.J.

**REPORT AND**              5/15/19
**RECOMMENDATION**

18 Civ. 1521 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

Plaintiff Liliana Rivera ("Plaintiff"), appearing *pro se*, commenced this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket No. 2).  Currently before this Court is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] (Docket No. 16).  Plaintiff has not responded or filed a cross-motion.[2] For the reasons set forth herein, the Court respectfully recommends granting the Commissioner's motion.

---

[1] The Commissioner's brief is hereinafter referred to as "Def. Br." (Docket No. 17).  Page number citations refer to the one assigned upon electronic filing.

[2] The Court extended Plaintiff's time to respond to the Commissioner's motion to March 22, 2019 and notified Plaintiff that if she did not submit a response or otherwise notify the Court of her status by March 22, 2019 the Court would deem the matter fully submitted. (Docket No. 26).  Plaintiff did not respond to the Commissioner's motion, and the matter is deemed fully submitted.

1

## I. BACKGROUND

Plaintiff was born on June 24, 1965. (R.[3] 191).  On November 25, 2014 Plaintiff applied for SSI and DIB, alleging she was disabled beginning August 31, 2012. (R. 15, 191).  After a hearing before Administrative Law Judge ("ALJ") Kevin Kenneally, the Social Security Administration ("SSA") denied Plaintiff's application. (R. 15).  The Appeals Council denied Plaintiff's request for review on December 19, 2017, making the ALJ's decision final. (R. 1).

### A.  Plaintiff's Medical Treatment

### 1.  Medical Records Prior to Plaintiff's Alleged Onset

Plaintiff was admitted to the North Central Bronx Hospital on February 26, 2008 with complaints of weakness in her left side, blurred vision and a mild headache. (R. 262).  Plaintiff was seen by attending physician Dr. Vimala Ramasamy and diagnosed with transient ischemic attack. (R. 262-63).  While admitted, Plaintiff underwent testing, a chest x-ray, echocardiogram, carotid artery sonogram, head CT scan, head MRI study, magnetic resonance angiogram, and 24-hour Holter monitoring, which all came back negative. (R. 262, 276-78, 293-96, 342-44).  Plaintiff was discharged on March 8, 2008 and told to resume her normal activity level and adopt a low sodium and low cholesterol diet. (R. 262).  Plaintiff returned to North Central Bronx Hospital on April 18, 2008 and August 22, 2008, complaining of chest pain. (R. 273-74).  During both visits, the x-rays were normal. (R. 274-75).

The medical record shows that Plaintiff visited the emergency room approximately once a year from 2009 to 2012.  She visited the emergency room on March 20, 2009, July 27, 2010 and June 3, 2011, and during each visit she complained of chest pain. (R. 309, 313, 456).  On

---

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on June 27, 2018. (Docket No. 14).  All page number citations to the certified administrative record refer to the page number assigned by the SSA.

January 9, 2012, Plaintiff returned to the emergency room complaining of abdominal pain and shortness of breath. (R. 462).  Plaintiff was given an IV and monitored. (R. 462).

**2.  Medical Records After Plaintiff's Alleged Onset**

**i.  Treatment Related to Plaintiff's Physical Conditions**

After 2012, Plaintiff saw her primary care providers at Urban Health Plan ("UHP") for follow-up evaluations and refills of her prescriptions.  At an appointment on May 10, 2013, Plaintiff saw Marie Plantin, PA-C to refill her medication. (R. 376).  A physical examination was unremarkable and showed that Plaintiff had a normal range of motion in her extremities. (R. 376).  On July 8, 2013, Plaintiff presented at the walk-in clinic at UHP with a left sided headache and chest discomfort upon palpation. (R. 374).  Sean Ramdeen, RPA-C, conducted a physical examination and found that Plaintiff's chest wall was tender to palpation. (R. 374).  At a July 31, 2013 visit, Plaintiff reported experiencing joint pain, swelling hands and fatigue. (R. 371).  Dr. Georgina Harden conducted a physical examination and found that Plaintiff was not in acute distress and had a normal range of motion in her extremities. (R. 371).   Plaintiff saw Felix Eke, RPA-C on November 4, 2013 for a medical evaluation. (R. 369).  A physical examination was unremarkable. (R. 369).

Plaintiff visited Dr. Claude Parola on March 5, 2014 with complaints of headaches and left shoulder pain. (R. 366).  A physical examination was normal. (R. 366).  Plaintiff saw Dr. Parola again on June 6, 2014 for a follow-up appointment and medication refill. (R. 359).  Plaintiff's physical examination was normal and her chest wall was nontender. (R. 359).  On November 11, 2014, Plaintiff visited Dr. Parola complaining of chest discomfort and headaches. (R. 356).  A physical examination was normal except that Plaintiff's chest wall was tender on palpation. (R. 356).  Dr. Parola assessed hypertension, hyperlipidemia, costochondritis and

depression and recommended that Plaintiff continue with her medication and referred Plaintiff to psychiatry. (R. 357).

At a routine follow-up visit on March 31, 2015, Dr. Parola found that Plaintiff's physical examination results were normal, her chest wall was nontender and her extremities had a normal range of motion. (R. 498). On June 2, 2015, Plaintiff visited Sandra Pineros, RPA-C with complaints of elbow pain, neck pain and headaches. (R. 505). She also reported difficulty sleeping. (R. 505). PA Pineros examined Plaintiff and found that her neck was supple and tender on the trapezius muscle. (R. 505). However, Plaintiff had a normal range of motion in her cervical spine and no trapezius spasm. (R. 505). PA Pineros observed no swelling in Plaintiff's left arm, no tenderness on palpation, and a good range of motion and strength in both of Plaintiff's arms. (R. 505). An x-ray of Plaintiff's cervical spine taken on June 2, 2015 showed that there was a "straightening of the cervical spine which may be due to muscle spasm" and "[m]ild degenerative changes." (R. 536). While there were "[s]mall marginal osteophytes" noted anteriorly at C4-5 and C5-6, there was "no acute fracture or subluxation" and "[t]he prevertebral soft tissues [were] unremarkable." (R. 536).

Plaintiff saw Dr. Parola for a medication refill on June 15, 2015. (R. 508). Plaintiff's physical examination was normal. (R. 508). On October 9, 2015, Plaintiff visited UHP complaining of pain in her left arm and reporting an 8/10 on the pain scale. (R. 515). Plaintiff stated it felt like she had a pinched nerve in her neck and had a tingling sensation down her left arm. (R. 515). Kara Moss, FNP, assessed osteoarthritis cervical spine and cervical radicular pain and prescribed Meloxicam and Gabapentin. (R. 515-16).

Plaintiff visited MedAlliance Medical Health ("MedAlliance") on September 9, 2015 complaining of abdominal pain and constipation. (R. 539). However, Plaintiff's physical

4

examination had no abnormalities. (R. 541).  Raja Saleela, FNP, ordered a colonoscopy. (R. 541).  Plaintiff returned to UHP on October 19, 2015 for medication refills and evaluation of her cholesterol. (R. 517).  Plaintiff denied any complaints. (R. 517).  Dr. Parola examined Plaintiff and the results were normal. (R. 517).

Plaintiff visited the emergency room at North Central Bronx Hospital on December 19, 2015 with complaints of chest pain. (R. 470).  However, an x-ray showed unremarkable findings and there was "[n]o evidence of acute cardiopulmonary findings." (R. 470).  Plaintiff saw Dr. Juan Escarfuller, a cardiologist at MedAlliance on February 25, 2016. (R. 412).  Plaintiff stated that she needed a cardiovascular evaluation in order to obtain medical clearance for a gastrointestinal procedure. (R. 412).  Plaintiff told Dr. Escarfuller that she was admitted to the emergency room in December 2015 for chest pain and palpitations, but she had not felt chest pain since then. (R. 412).  On February 29, 2016, Plaintiff returned to UHP for a medical re-evaluation and medication refills. (R. 526).  According to Dr. Parola, her physical examination was unremarkable. (R. 526).

A stress echocardiogram conducted on March 14, 2016 was "normal" and "negative for ischemia." (R. 432).  Dr. Escarfuller opined that overall the "left ventricular systolic function was normal without regional wall motion abnormalities" and the "left ventricular ejection fraction with stress was estimated at 70%." (R. 432).  He concluded that the stress electrocardiogram was "normal." (R. 432).  At a follow-up visit with Dr. Escarfuller on March 17, 2016, Plaintiff stated that she was experiencing chest pain for the past month. (R. 444).  However, Plaintiff's physical examination was normal, including her respiration rhythm and depth. (R. 445).  Dr. Escarfuller noted that Plaintiff's blood pressure was controlled and she should continue taking Metoprolol, dieting and exercising. (R. 445).  Plaintiff returned to visit

5

Dr. Escarfuller again on March 24, 2016 with complaints of high blood pressure. (R. 447). Plaintiff's physical examination was unchanged since her last visit. (R. 447).

Plaintiff saw Dr. Boris Chusid at MedAlliance on April 19, 2016, complaining of constipation. (R. 405). According to Dr. Chusid, Plaintiff missed her previous appointment for a colon evaluation. (R. 405). Plaintiff denied chest pain, abdominal pain, stiffness, pain or joint swelling. (R. 405). The physical examination was unremarkable. (R. 406). Dr. Chusid recommended screening for colon cancer. (R. 406). At a follow-up appointment with Dr. Chusid on June 14, 2016, Plaintiff reported that her constipation was alleviated. (R. 407).

On July 28, 2016, Plaintiff saw Dr. Escarfuller for follow up. (R. 409). While Plaintiff presented with high blood pressure and hypertension, Plaintiff denied experiencing chest pain symptoms and reported that she initiated a daily exercise routine. (R. 409). Dr. Escarfuller noted that Plaintiff's hypertension remained "optimally controlled," and her echo and stress echo studies were "normal and reassuring." (R. 411). At a follow-up visit with Dr. Parola on August 1, 2016, Plaintiff's physical examination was again normal and her chest wall was nontender. (R. 529). Plaintiff visited the emergency department at North Central Bronx Hospital on September 21, 2016 with complaints of neck, shoulder and chest pain that worsened with movement. (R. 484). Mark Galliguez, PA prescribed Plaintiff Ibuprofen and noted that her condition improved upon discharge. (R. 486).

**ii. Treatment Related to Plaintiff's Mental Conditions**

During a routine visit to UHP on November 11, 2014 Plaintiff informed Dr. Parola that she was feeling depressed. (R. 357). Dr. Parola referred Plaintiff for a psychiatric evaluation. (R. 357). Plaintiff saw Janely Perez, LCSW, on December 8, 2014 for a behavioral health screening. (R. 351). Plaintiff reported feeling depressed and suffering from crying spells, difficulty sleeping, lack of motivation and decreased energy. (R. 351). Ms. Perez found that Plaintiff

appeared well-groomed with a cooperative attitude and appropriate affect, but her mood was

depressed. (R. 351).  Ms. Perez scheduled Plaintiff for an initial psychiatric assessment with John

Ruiz, LCSW. (R. 351).  Plaintiff attended a psychiatric assessment with Mr. Ruiz on the same

day. (R. 353).  He noted that Plaintiff was coping with recent housing changes as her daughter

and granddaughter no longer lived in her apartment and stated that Plaintiff benefitted from

positive relationships with her siblings and church attendance. (R. 354).  Mr. Ruiz diagnosed

Plaintiff with depressive disorder and Plaintiff agreed to short-term therapy. (R. 353-54).

Plaintiff saw Dr. Frank Reyes at UHP on February 18, 2015 and indicated that she was

feeling depressed and could not sleep well. (R. 495).  Plaintiff told Dr. Reyes that she had a long

history of insomnia, felt depressed on and off, frequently cried and had difficulty with focus,

concentration and memory. (R. 495).  Plaintiff noted that she saw a psychiatrist once at UHP

during a brief depressive episode. (R. 495).  She received medication, but she did not take it

regularly and stopped her psychiatric sessions after the first visit. (R. 495).  Dr. Reyes diagnosed

Plaintiff with adjustment disorder with depressed mood and insomnia (not otherwise specified).

(R. 496).  He prescribed Trazodone and recommended supportive therapy and sleep hygiene

education. (R. 496).  At an April 29, 2015 appointment with Dr. Reyes, Plaintiff reported feeling

better and less depressed with fair sleep and a regular appetite. (R. 500).  Dr. Reyes stated that

Plaintiff "continued doing better with medi[c]ations." (R. 501).

**B.  Consulting Physicians**

The administrative record contains evaluations by four consulting physicians.

**1.  Marilee Mescon, M.D.**

Plaintiff saw Dr. Marilee Mescon on January 19, 2015 for an internal medicine

examination. (R. 386).  Plaintiff stated that she had back pain that began about one year ago

when she slipped and fell while she was working as a home health aide. (R. 386).  She described

the pain in her back as aching and on a 9/10 to 8/10 on the pain scale. (R. 386).  Plaintiff indicated that she never had physical therapy for her back, did not use a back brace, and that the pain worsened when she stood. (R. 386).  According to Plaintiff, she was hospitalized at North Central Bronx Hospital in 2012, 2013 and 2014. (R. 386).  Her first hospitalization in 2012 was due to a stroke while her hospitalizations in 2013 and 2014 were for heart attacks. (R. 386).

Plaintiff told Dr. Mescon that she lived with her two sons who did the cooking, cleaning, laundry and shopping. (R. 387).  Plaintiff could shower, bathe and dress herself. (R. 387).  She also had the capacity to watch television, listen to the radio, read, do errands, socialize with friends, and perform household chores. (R. 387).

Dr. Mescon observed that Plaintiff appeared to be in no acute distress. (R. 37).  Her gait and stance were normal, she could walk on her heels and toes without difficulty, and she could squat fully. (R. 387).  A physical examination did not show any abnormalities and Plaintiff maintained 5/5 strength in her upper and lower extremities and 5/5 grip strength. (R. 388-89).  An x-ray of Plaintiff's lumbosacral spine came back normal. (R. 389).

Dr. Mescon diagnosed Plaintiff with back pain, a stroke with no focal neurological deficits, and a history of heart attack. (R. 389).  Plaintiff's prognosis was fair and Dr. Mescon opined that Plaintiff had no limitations in her ability to sit or stand. (R. 389).  However, Plaintiff's capacity to climb, push, pull or carry heavy objects would be severely limited due to Plaintiff's history of heart attacks. (R. 389).

**2.  Fredelyn Damari, Ph.D.**

Dr. Fredelyn Damari conducted a psychiatric evaluation of Plaintiff on January 19, 2015. (R. 380).  According to Plaintiff, she lived with her sons, ages 21 and 16 and had a 28-year-old daughter who lived elsewhere. (R. 380).  Plaintiff worked as a home attendant for eight years,

but she had to leave her job due to her medical conditions. (R. 380). She experienced pain in her fingers, hands and back. (R. 380). Plaintiff had never been hospitalized or received outpatient treatment for her psychiatric conditions, and she saw John Ruiz at UHP two times since early 2015 for depression. (R. 380).

At the time of the psychiatric evaluation, Plaintiff's sleep and appetite were normal. (R. 380). However, Plaintiff reported symptoms of depression, dysphoric moods, anxiety, fatigue and pain in her hands and back. (R. 380). Dr. Damari found that Plaintiff was cooperative and her overall presentation was adequate. (R. 381). Plaintiff's speech was clear, her thought process was coherent and goal-directed, and Plaintiff's speech and thought content were appropriate. (R. 381). However, Dr. Damari found that Plaintiff's attention and concentration were impaired, possibly due to Plaintiff's limited academic background. (R. 382). For example, Plaintiff had difficulty counting by twos until 20, had difficulty making change for a dollar, and could not count backwards from 20 by threes. (R. 382). Dr. Damari also determined that Plaintiff's recent and remote memory skills were mildly impaired. (R. 382). Plaintiff could repeat 3 out of 3 objects immediately, recall 1 out of 3 objects after five minutes, and repeat 4 and 5 digits forward. (R. 382). Plaintiff was unable to state 3 digits backwards and had difficulty understanding the concept. (R. 382). Dr. Damari concluded that Plaintiff's intellectual functioning was borderline to deficient. (R. 382).

With respect to Plaintiff's daily activities, Dr. Damari reported that Plaintiff could dress, shower and groom herself, although she had difficulty raising her arm. (R. 382). Plaintiff cleaned about two times a week, but experienced back pain when doing so. (R. 382). Plaintiff required assistance with laundry, shopping, and managing her money. (R. 382). Plaintiff did not drive and took public transportation. (R. 382). Plaintiff stated that she enjoyed watching

television, listening to the radio, and reading. (R. 382). She also enjoyed going on errands and socializing with her friends, which is how she spent her days. (R. 382).

Dr. Damari opined that Plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and make appropriate decisions and relate adequately to others. (R. 382-83). Plaintiff was mildly impaired in her ability to appropriately deal with stress and significantly impaired in her ability to learn new tasks and perform complex tasks independently. (R. 382-83).

**3. S. Juringa, Ph.D.**

Dr. Juringa reviewed the record on January 30, 2015 and opined that Plaintiff's impairments were non-severe. (R. 79-80). According to Dr. Juringa, Plaintiff was not restricted in her activities of daily living or social functioning and had only mild difficulties in maintaining concentration, persistence or pace. (R. 80).

**4. Ruby Phillips, Ph.D.**

Dr. Ruby Phillips conducted a psychiatric evaluation of Plaintiff on July 26, 2016. (R. 393). Plaintiff reported that she frequently awakened during the middle of the night and stated that she had a loss of appetite. (R. 393). Her depressive symptoms included dysphoric moods and irritability. (R. 393). Dr. Phillips observed that Plaintiff was cooperative, oriented, her voice was clear, and her thought process appeared coherent and goal-oriented. (R. 394). Plaintiff's attention, concentration, and recent and remote memory skills were intact. (R. 394-95). Plaintiff was able to recall 3 out of 3 objects immediately and 3 out of 3 objects after five minutes. (R. 395). Plaintiff recalled 4 digits forward and 3 digits backward. (R. 395). Dr. Phillips concluded that Plaintiff's intellectual functioning was average. (R. 395). According to Plaintiff, she could dress, bathe, groom herself and cook, but with some pain. (R. 395). Plaintiff could do light cleaning and laundry, shop, and manage money with the assistance of her son. (R. 395). Dr.

Phillips opined that Plaintiff was not limited in her ability to function on a daily basis, and her prognosis was good given adequate pain management. (R. 396).

## C.  Plaintiff's Testimony

Plaintiff testified at the September 22, 2016 hearing before ALJ Kenneally with the assistance of a Spanish-language interpreter. (R. 31).  Plaintiff testified that she was 51-years old and lived with her 17-year old son on the third floor of a walkup building. (R. 38-39).  Plaintiff took a taxi to get to the hearing and explained that she could not regularly use public transportation due to getting dizzy. (R. 39).

Plaintiff completed ninth grade in the Dominican Republic, and she did not go back to school after she was eighteen years old. (R. 57).  She could not speak, write or read English. (R. 58).  Previously, Plaintiff took a course to become a home attendant and began working as a home attendant in 2005. (R. 58).

According to Plaintiff, she saw a cardiologist at MedAlliance and her primary care physician at UHP. (R. 39-40).  She also went to the emergency room at North Central Bronx Hospital several times due to chest and back pain. (R. 40-41).  She often experienced pain in her chest and her entire left side. (R. 42).  Plaintiff indicated that she was unable to stand for longer than fifteen minutes and could sit continuously for about 20 minutes. (R. 43).  Plaintiff testified that arthritis in her neck, arm and back prevented her from working. (R. 41, 49).

Plaintiff testified that she stayed home during the day and attended appointments. (R. 44).  She slept poorly at night, had difficulty concentrating, and had memory problems ever since suffering from a stroke in 2008. (R. 45, 48).  Plaintiff took Metoprolol for hypertension, Zocor and Fenofibrate for cholesterol, Flexeril for her muscles, Gabapentin, Meloxicam for pain, and Trazadone to help her sleep. (R. 43-44).

**D.  Vocational Expert Testimony**

At the September 22, 2016 hearing, vocational expert Christina Boardman also testified. (R. 55).  The ALJ asked Ms. Boardman to assume a hypothetical person of Plaintiff's age, education and work history with the residual functional capacity ("RFC") to engage in the full range of medium work, except that she could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds and was limited to performing simple, routine and repetitive tasks and making simple work-related decisions. (R. 59).  Based on the assumptions provided by the ALJ, Ms. Boardman testified that such an individual could perform work as a linen room attendant, a kitchen helper or a laundry laborer. (R. 60-61).

The ALJ then added the assumption that the hypothetical individual could perform the full range of light work with the same limitations. (R. 61).  According to Ms. Boardman, such an individual could perform work as a routing clerk, a Department of Transportation title marker, or a housekeeper. (R. 62).

Finally, the ALJ asked the vocational expert to assume that the individual in the second hypothetical would be off task for 20% of the time in an 8-hour workday. (R. 63).  Ms. Boardman testified that such an individual could not competitively perform any of the jobs she identified. (R. 63).

Plaintiff's attorney asked the vocational expert to assume in the first and second hypothetical that an individual had the additional restriction of only occasionally grasping, fingering, and handling with her left hand. (R. 66).  Ms. Boardman opined that such a physical restriction would eliminate all unskilled jobs at the medium and light exertional levels. (R. 67-68).

12

**E. ALJ Kenneally's Decision**

In his decision, dated December 19, 2016, ALJ Kenneally followed the five-step procedure established by the Commissioner for evaluating whether an individual is disabled. *See* 20 C.F.R. 404.1520(a), 20 C.F.R. § 416.920.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 31, 2012, the alleged onset date. (R. 17).  At step two, the ALJ found that Plaintiff had the following severe impairments: cervicalgia with mild degenerative changes and an adjustment disorder with a depressed mood. (R. 17).  The ALJ determined that Plaintiff had the following non-severe impairments: hyperlipidemia, hypertension, hyperglycemia, gastroenteritis, a history of transient ischemic attack and obesity. (R. 18).  The ALJ also found that Plaintiff's learning disorder was a non-medically determinable impairment. (R. 19).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 19).  Before step four of the sequential evaluation, the ALJ made the following RFC assessment:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work except that she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  She is limited to performing simple, routine, and repetitive tasks.  She is limited to making simple work-related decisions.

(R. 21).  At step four, the ALJ found that Plaintiff could no longer perform any past relevant work. (R. 24).  Proceeding to step five, the ALJ considered Plaintiff's age, education, work experience and RFC, and concluded that Plaintiff could perform work that exists in significant numbers in the national economy. (R. 25).  ALJ Kenneally found that Plaintiff

could perform work as a linen room attendant, a kitchen helper or a clerical sorter. (R. 25-26).  The ALJ, therefore, determined that Plaintiff was not disabled. (R. 26).

## II.  DISCUSSION

In her complaint, Plaintiff alleges that the decision of the ALJ is erroneous, contrary to law and not supported by substantial evidence in the record. (Docket No. 2).  The Commissioner argues that the ALJ's decision is free of legal error and supported by substantial evidence. (Def. Br. at 20).  Plaintiff has not responded to the Commissioner's motion.  However, because Plaintiff is proceeding *pro se*, the Court reviews the administrative record and makes this recommendation on the merits. *See Pena v. Barnhart*, No. 01 Civ. 502 (BSJ)(DF), 2002 WL 31487903, at *7 (S.D.N.Y. Oct. 29, 2002).[4]

### A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the

---

[4] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and other cases, *infra*, that are unpublished or only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Plaintiff.

> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. § 416.920(a)(4)(i)-(v); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and

bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012).

**B. Standard of Review**

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review

is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. §

405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo*

whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the

disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the

decision of the administrative agency by simply deferring to the factual findings of the ALJ."

*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109,

112 (2d Cir. 1984)). Therefore, "[f]ailure to apply the correct legal standards is grounds for

reversal." *Id.* "Where there are gaps in the administrative record or the ALJ has applied an

improper legal standard," remand to the Commissioner "for further development of the

evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C.  Duty to Develop the Record and the Treating Physician Rule

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, an ALJ, unlike a judge in a trial, has an affirmative duty to develop the record on behalf of all claimants. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  The ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111.  The applicable SSA regulations provide, in relevant part, "we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." 20 C.F.R. § 416.912(d) (version effective Apr. 20, 2015 to Mar. 26, 2017); *see also* 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i).

"However, the duty to develop the record is 'not absolute,' and requires 'the ALJ only to ensure that the record contains sufficient evidence to make a determination.'" *Johnson v. Comm'r of Soc. Sec.*, No. 17 Civ. 5598 (BCM), 2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018) (quoting *Bussi v. Barnhart*, No. 01 Civ. 4330 (GEL), 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003)).  A court may uphold an ALJ's determination where the record is "adequate to permit an informed finding." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses 'a complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n. 5 (citation omitted).

"'The duty to develop the record goes hand in hand with the treating physician rule, which requires the ALJ to give special deference to the opinion of a claimant's treating physician.'" *Paredes v. Comm'r of Soc. Sec.*, No. 16 Civ. 00810 (BCM), 2017 WL 2210865, at *17 (S.D.N.Y. May 19, 2017) (quoting *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004)).  "An ALJ cannot, of course, pay deference to the opinion of the claimant's treating physician if no such opinion is in the record." *Id.*  Consequently, an ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of [ ] that treating physician as to the existence, the nature, and the severity of the claimed disability." *Rivera v. Comm'r of Soc. Sec.*, No. 14 Civ. 6567 (KPF), 2015 WL 6619367, at *11 (S.D.N.Y. Oct. 30, 2015).  However, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where [ ] the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 Fed. App'x at 34.  Indeed, "courts in this District have found that 'it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician.'" *Rivera*, 2015 WL 6619367, at *11 (quoting *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015)).

In this case, the ALJ had medical records from all the providers listed in Plaintiff's application paperwork and that Plaintiff identified at the hearing. (R. 39-40, 223-24).  The ALJ obtained extensive treatment records and ordered consultative examinations.  Plaintiff was also represented by legal counsel before the ALJ, and counsel submitted additional medical records to the ALJ.

The ALJ, however, did not obtain treating source statements from Plaintiff's treating physicians before denying benefits.  The Commissioner argues that the absence of opinions from

Plaintiff's treating physicians does not require remand because the record contains enough evidence for the ALJ to assess Plaintiff's RFC. (Def. Br. at 21).  The Court agrees.  The medical record includes extensive treatment notes from all of Plaintiff's doctors from both before and during the relevant period.  The treatment notes from Plaintiff's treating physicians as well as the medical opinions provided by the consultative examiners support the ALJ's RFC assessment. Based on the circumstances of this case, the ALJ was not required to obtain a medical source statement from one of Plaintiff's treating physicians given the extensive medical record. *See Pellam v. Astrue*, 508 Fed. Appx. 87, 90 (2d Cir. 2013) ("Under these circumstances—especially considering that the ALJ also had all of the treatment notes from [plaintiff's] treating physicians—we do not think that the ALJ had any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians.").  Furthermore, the Court does not identify any apparent gaps in the administrative record that would materially alter the ALJ's analysis.  Accordingly, the Court respectfully recommends finding that the ALJ satisfied his duty to develop the record.

**D.  Substantial Evidence**

        The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).  Once an ALJ finds facts, a court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (citation and internal quotation marks omitted).  Thus, the findings of fact in a disability determination must be upheld if they are supported by substantial evidence, even if there is also substantial evidence for the claimant's position. *See DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's denial of disability benefits where there was

substantial evidence for both sides); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) ("'[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'") (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

Because the Complaint contains little detail and Plaintiff did not oppose the Commissioner's motion, the Court is left to surmise the specific nature of Plaintiff's objections to the ALJ's decision.  The ALJ ruled adversely to Plaintiff with respect to the following determinations: (1) Plaintiff's hyperlipidemia, hypertension, hyperglycemia, arthralgia, gastroenteritis, transient ischemic attack and obesity were non-severe; (2) Plaintiff's learning disorder was a non-medically determinable impairment; (3) Plaintiff's impairments did not meet or equal a listed impairment; (4) Plaintiff retained the RFC to perform medium work with some limitations; and (5) jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 15-25).  These determinations by the ALJ are discussed, in turn, below.

## 1.  The ALJ's Determination That Some of Plaintiff's Impairments Were Not Severe

Substantial evidence supports the ALJ's conclusion that Plaintiff's hyperlipidemia, hypertension, hyperglycemia, arthralgia, gastroenteritis, transient ischemic attack and obesity were non-severe impairments.  To be considered "severe" within the meaning of the regulations, an impairment or combination of impairments must significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

The record shows that Plaintiff's hyperlipidemia was stable with medication, and as the ALJ noted, her laboratory tests from March 7, 2014, November 12, 2014 and June 16, 2015 demonstrated that Plaintiff's cholesterol levels were normal. (R. 18, 511-12).  Plaintiff's medical

19

records similarly show that Plaintiff's hypertension was well controlled. (R. 411, 445).  Dr. Parola diagnosed Plaintiff with hyperglycemia and arthralgia on June 15, 2015. (R. 508).  The only mention of these diagnoses appears in Dr. Parola's June 15, 2015 treatment notes, and there is no evidence that these conditions persisted or worsened.  Dr. Parola recommended that Plaintiff take Ibuprofen to alleviate the symptoms of arthralgia, further suggesting that this impairment was not severe. (R. 508).

Plaintiff visited the emergency room on November 21, 2015 presenting with gastroenteritis. (R. 482).  However, as the ALJ noted, Plaintiff's gastrointestinal examinations were routinely benign. (R. 406, 408, 410, 413, 445, 447).  The record contains Plaintiff's hospital records from February 2008 when Plaintiff was admitted to the North Central Bronx Hospital after suffering from a transient ischemic attack. (R. 262-63).  Numerous tests ran while Plaintiff was admitted came back negative, and Plaintiff was discharged with the recommendation to adopt a low salt and low cholesterol diet. (R. 262, 276-78, 293-96, 342-44).  There is no indication that Plaintiff suffered from recurring transient ischemic attacks after she was discharged.  With respect to Plaintiff's obesity, Plaintiff's records show that Plaintiff was improving, and Plaintiff adopted an exercise and dietary plan.  (R. 445).  Dr. Escarfuller noted on March 24, 2016 that although Plaintiff showed signs of obesity, she could mobilize without assistance, was well developed and appeared in no acute stress. (R. 447).

Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff's hyperlipidemia, hypertension, hyperglycemia, arthralgias, gastroenteritis, transient ischemic attack and obesity were non-severe impairments.

**2.  The ALJ's Determination That Plaintiff's Learning Disorder Was a Non-Medically Determinable Impairment**

Substantial evidence also supports the ALJ's determination that Plaintiff's learning disorder was a non-medically determinable impairment.  The record contains a consultative opinion from Dr. Damari opining that Plaintiff had borderline to deficient intellectual functioning.  However, the ALJ explained that Plaintiff had never been diagnosed with a specific learning disorder by her treating physicians, and two years later during a July 26, 2016 psychological consultative examination, Dr. Phillips found that Plaintiff's cognitive functioning was average. (R. 19).  The ALJ reasoned that there were no medical signs or laboratory findings substantiating the existence of a medically determinable learning disorder, and Plaintiff's past work as a home health aide suggested that Plaintiff was capable of work of moderate complexity. (R. 19).  The Court agrees that Plaintiff's learning disorder is not supported by a clear diagnosis or medical findings.  Accordingly, the ALJ's conclusion that Plaintiff's learning disorder was a non-medically determinable impairment is supported by substantial evidence.

**3.  The ALJ's Determination That Plaintiff's Impairments Did Not Meet or Equal a Listed Impairment**

Under a theory of presumptive disability, a claimant may be eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The listings specify the criteria for impairments that are considered presumptively disabling. *See* 20 C.F.R. §§ 404.1525(a), 416.925(a).  A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).

Substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed

impairments.  The ALJ specifically considered whether Plaintiff's cervical disc disorder met or

equaled the criteria in Listing 1.04, which concerns disorders of the spine, and found that it did

not. (R. 19).  Listing 1.04 requires compromise of a nerve or the spinal cord with the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis . . .
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication . . . and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.00, 1.04.  The ALJ explained that Plaintiff's gait was

regularly described as normal and there were no diagnoses of lumbar spinal stenosis, spinal

arachnoiditis or nerve root compression. (R. 19).

The ALJ considered Listing 12.04 for Plaintiff's depression, but he found that her

impairment did not meet the criteria. (R. 19).  Listing 12.04 is satisfied by meeting the criteria of

paragraphs A and B or paragraphs A and C.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.  In this

case, the ALJ found that Plaintiff's mental impairments satisfied some of the paragraph A

criteria due to her symptoms of crying spells, loss of sleep, lack of motivation and decreased

energy. (R. 19).  The ALJ, however, found that Plaintiff did not meet the criteria of paragraphs B

or C. (R. 19).

To satisfy paragraph B criteria, mental impairments must result in at least two of the

following: marked restriction of daily activities; marked difficulties in maintaining social

functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated

22

episodes of decompensation, each of extended duration.[5] 20 C.F.R. Pt. 404 Subpt. P, App.1 §

12.04(B) (2016). Here, the record shows that Plaintiff had mild restrictions in her daily living.

For example, she could cook, clean, care for her son and care for her personal hygiene. (R. 382,

395). Her difficulties with social functioning were also mild. Plaintiff socialized with her family

and had strong family relationships, and Dr. Damari and Dr. Phillips opined that Plaintiff had no

difficulties relating with others. (R. 382-83, 387, 395). The record supports the ALJ's

conclusion that Plaintiff had moderate difficulties with respect to concentration, persistence or

pace. Dr. Damari opined that Plaintiff had impaired concentration, difficulty counting by 2s, and

difficulty making change from a dollar. (R. 382). However, Dr. Phillips found in a later

consultative examination that Plaintiff could perform simple calculations, but she was unable to

perform serial 3s due to problems with mathematics. (R. 394). The record does not show any

medically identifiable episodes of decompensation for an extended duration.

Paragraph C establishes criteria for claimants with a history of the disorder for at least

two years who experience (1) repeated episodes of decompensation; (2) a residual disease

process that has resulted in such marginal adjustment that even a minimal increase in mental

demands or change in the environment would cause the individual to decompensate; or (3)

inability to function outside of a highly supportive living environment. 20 C.F.R. 404, Subpt. P,

App.1 § 12.04(C) (2016). The record supports the ALJ's determination that Plaintiff did not

meet any of the requirements of paragraph C.

---

[5] Following the date of the ALJ's decision, revisions to the paragraphs B and C criteria became effective on January 17, 2017. *See* Revised Med. Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). However, the SSA stated that it expects "Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions." *Id.* at 66138 n. 1.

Accordingly, substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments.

### 4. The ALJ's Determination of Plaintiff's RFC

Substantial evidence supports the ALJ's RFC determination. The RFC is the most an individual can do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for deciding the claimant's RFC and, in making that determination, the ALJ must consider all relevant medical and other evidence, including any statements about what the claimant can still do provided by any medical sources. *See* 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3), 404.1546(c), 416.927(d)(2), 416.945(a)(3), 416.946(c). While an ALJ will consider medical opinions on a plaintiff's functioning, ultimately the ALJ is tasked with reaching an RFC assessment based on the record as a whole. 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.").

Here, the ALJ concluded that Plaintiff had the following RFC:

[C]laimant has the residual functional capacity to perform medium work except that she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds. She is limited to performing simple, routine and repetitive tasks. She is limited to making simple work-related decisions.

(R. 21). The ALJ performed his duty of evaluating and reviewing the record to find that Plaintiff retained the RFC to perform medium work, and he discussed in detail the evidence in the record and assessed Plaintiff's condition longitudinally.

With respect to Plaintiff's physical RFC, the ALJ considered the treatment notes from Plaintiff's longtime doctors, including her cardiologist and primary care physician, who routinely reported that Plaintiff's physical examinations were unremarkable, including

no abnormalities in Plaintiff's chest, back or extremities. (R. 406, 411, 432, 445, 447, 498, 359, 366, 369, 371, 376, 505, 508, 517, 526, 529, 541).  Plaintiff's June 2, 2015 cervical x-ray report showed that Plaintiff had a straightening of the cervical spine that may be due to muscle spasm, and further stated that Plaintiff's cervical spine had no signs of acute fracture or subluxation. (R. 536).  The treatment notes are consistent with Dr. Mescon's consultative report, which showed that Plaintiff had a normal range of motion in her upper and lower extremities, a normal gait, and full flexion, extension, lateral flexion and rotary movement in her cervical spine. (R. 387-88).  Plaintiff could also walk on her heels and toes without difficulty and squat fully. (R. 387).   The ALJ gave great weight to Dr. Mescon's consultative opinion that Plaintiff had no limitations in sitting or standing, but she was severely limited in her capacity to climb, push, pull and carry heavy objects. (R. 24).  The record substantially supports the ALJ's finding that Plaintiff could perform medium work with some physical limitations.

As for Plaintiff's mental RFC, the ALJ limited Plaintiff to simple, routine and repetitive tasks with simple work-related decisions. (R. 21).  The ALJ considered the psychological reports from John Ruiz, a licensed clinical social worker, as well as Dr. Frank Reyes, Plaintiff's psychiatrist.  While Plaintiff told Dr. Reyes that she had a depressive episode, she reported that she stopped attending her psychiatric evaluations after the first visit and did not regularly take her medication. (R. 495).  Dr. Reyes conducted a mental status examination and found that Plaintiff had fair attention, insight, judgment and memory. (R. 496).  He also found that her intelligence was average. (R. 496).  The ALJ also relied upon the psychological opinions of consultative examiners Dr. Damari and Dr. Phillips. (R. 23).  The ALJ gave great weight to Dr. Damari's opinion that Plaintiff was capable of performing simple tasks, but she was significantly

limited in performing complex tasks. (R. 24).  As discussed above, the ALJ explained in detail

why he gave little weight to Dr. Damari's opinion that Plaintiff had a learning disorder. *See*

Section II.D.2, *supra*.  The ALJ also gave little weight to Dr. Phillips' and Dr. Suriga's opinions

that Plaintiff had no mental limitations, and he cited to medical records indicating that Plaintiff

was restricted to unskilled work. (R. 24).  The ALJ thoroughly considered the opinion and non-

opinion testimony in the record with regards to Plaintiff's mental RFC, and substantial evidence

supports his conclusion.

**5.  The ALJ's Determination That Plaintiff Could Perform Work That Existed in Significant Numbers in the National Economy**

The ALJ concluded that while Plaintiff could not return to her past relevant job because it

was too mentally demanding, there were still jobs that existed in significant numbers in the

national economy that Plaintiff could perform. (R. 24-25).  At step five, an ALJ may make a

determination by "applying the Medical Vocational Guidelines or by adducing testimony of a

vocational expert." *Puente v. Comm'r of Soc. Sec.*, 130 F. Supp. 3d 881, 896 (S.D.N.Y. 2015)

(quoting *McIntyre*, 758 F.3d at 151).   Here, relying upon the testimony of the vocational expert

and considering Plaintiff's age, education, work experience and RFC, the ALJ determined that

Plaintiff could perform work as a linen room attendant, a kitchen helper or a clerical sorter. (R.

25-26).  As discussed above, there was no error in the ALJ's RFC determination, and the

vocational expert's testimony substantially supports the ALJ's determination at step five of the

sequential evaluation.

**III.  CONCLUSION**

For the foregoing reasons, the Court respectfully recommends granting the

Commissioner's motion.  The Clerk of Court is requested to mail a copy of this Report and

Recommendation to the *pro se* Plaintiff.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Report and

Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for

computing time).  If copies of this Report and Recommendation are served upon the parties by

mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written

objections. *See* Fed. R. Civ. P. 6(d).  A party may respond to another party's objections within

fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2).  Objections and

responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies

delivered to the chambers of the Honorable Cathy Seibel at the United States District Court,

Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to

the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy

Seibel and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will result in a waiver of objections and will preclude later appellate review of

any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).


Dated:   April 24, 2019
       White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge

27